UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RUSSELL D. TITTLE, | CASE NO. 1:21-CV-00398-CEF |
| Plaintiff, | JUDGE CHARLES E. FLEMING |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Russell D. Tittle filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On February 22, 2021, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry of May 25, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

PROCEDURAL BACKGROUND

Mr. Tittle filed for DIB and SSI on July 11, 2013, alleging a disability onset date of August 31, 2012. (Tr. 356). The claims were denied initially and on reconsideration. (Tr. 369, 384, 402, 418). He then requested a hearing before an Administrative Law Judge. (Tr. 463). Mr. Tittle (represented by counsel), and a vocational expert ("VE") testified at a hearing before ALJ Catherine Ma on November 11, 2015. (Tr. 296-355). On March 17, 2016,  ALJ Ma issued a written decision finding Mr. Tittle not disabled. (Tr. 425-38).

The Appeals Council granted Mr. Tittle's request for review and determined ALJ Ma did not adequately evaluate medical opinions from Lyndsey Ruhe, D.O., John Comley, Psy.D., and Perry Williams, M.D. (Tr. 447). The Appeals Council vacated ALJ Ma's decision and remanded the case for further proceedings. (Tr. 447).

On March 4, 2020, after two additional hearings, ALJ Ma issued a second written decision finding Mr. Tittle not disabled. (Tr. 221-35). The Appeals Council denied Mr. Tittle's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Mr. Tittle timely filed this action on February 19, 2021. (ECF #1).

FACTUAL BACKGROUND

I.   ADMINISTRATIVE HEARING

The ALJ held three hearings on Mr. Tittle's applications for DIB and SSI. The following summarizes the testimony of Mr. Tittle and the three VEs, presented during the hearings before the ALJ.

A.      The First Hearing

At the first hearing, Mr. Tittle testified he lived on the second floor of an apartment building by himself. (Tr. 304). He has pain in his feet from plantar fasciitis, hip and low back pain, and left arm pain. (Tr. 320). Additionally, he does not like to be around large crowds, hears voices, and has memory issues. (*Id.*). His feet (particularly the heel and the arch), back, and hip hurt after standing or walking for about ten minutes. (Tr. 321, 328). Mr. Tittle is unable to lift or carry much weight anymore because doing so aggravates his back and causes a burning, stabbing sensation. (Tr. 327-28). Bending and lateral movements also make his back hurt. (Tr. 328). Mr. Tittle testified that his girlfriend helped him put on his shoes and socks. (*Id.*). When sitting, Mr. Tittle fidgets and moves side-to-side to try to alleviate the nagging feeling of a knife in his back. (*Id.*). He has difficulty with overhead reaching because of the pain in his arm and grinding feeling in his shoulders. (Tr. 328-29).

Mr. Tittle's hip pain stems from a 1990 car accident where he injured his pelvis, the right side of his ribs, and right knee, and sustained a concussion. (Tr. 322). Mr. Tittle endorsed other past trauma, including being involved in other car accidents, getting hit in the face with a pipe a few times, falling off a ladder, and falling through ice. (Tr. 325, 326). He has pain in the thoracic and lumbar region of his spine. (Tr. 324). Mr. Tittle has been on various medications for pain, including Tramadol, Flexeril, naproxen, and prednisone. (Tr. 325). Mr. Tittle's left arm pain started while he was working in a job that required lifting axles. (*Id.*). He did not completely recover and continues to have arm pain. (*Id.*).

Mr. Tittle also has anxiety. (Tr. 326). His symptoms include pain on the left side of his chest, profuse sweating, and nervousness and anxiousness. (*Id.*). Mr. Tittle testified it feels as

3

though he is having a heart attack. (*Id.*). Mr. Tittle attributes his memory problems to the various trauma he has sustained throughout his life, including the multiple car accidents and blows to the head. (*Id.*). He hears voices, which causes stress and paralyzes him. (*Id.*). Mr. Tittle also has mood swings and experiences crying spells when depressed. (*Id.*). His sleep is disturbed by strange dreams and nightmares; sometimes he cannot sleep at all. (Tr. 327).

Mr. Tittle describes himself as a loner and does not like being around a lot of people. (Tr. 326). He rarely leaves his house. (Tr. 327). On a typical day, Mr. Tittle wakes up at about 7:00 a.m. and drinks coffee. (Tr. 334). Throughout the day, Mr. Tittle listens to the radio or, weather permitting, sits outside. (Tr. 334-35). Mr. Tittle occasionally visits with an old friend, but usually at his own house. (Tr. 332). His daughter also stops by his place about twice per month. (*Id.*). Mr. Tittle reads a little bit as a hobby. (*Id.*). He does not have a driver's license and does not drive. (Tr. 305). To get around, Mr. Tittle walks as much as he can. (Tr. 306). His girlfriend comes over to help him and will take him to the grocery store. (*Id.*; Tr. 330). She vacuums and sweeps Mr. Tittle's apartment and does his laundry. (Tr. 331). When at the grocery store, Mr. Tittle's girlfriend pushes the cart and Mr. Tittle points to the items he needs. (Tr. 330). She also carries the groceries upstairs for him. (*Id.*). Mr. Tittle can shower on his own. (Tr. 334). He can prepare light meals for himself. (Tr. 331). Because he has forgotten food on the stove or in the oven before, he tries to stick with foods that do not need to be cooked. (*Id.*). Mr. Tittle can stand and do the dishes for about ten minutes before his back begins to hurt. (*Id.*).

The ALJ asked Mr. Tittle about his past experience building horse stalls with his daughter in 2014. (Tr. 332). Mr. Tittle corrected the ALJ, noting he did not build horse stalls, but rather helped his daughter hose out the sheds. (Tr. 332-333). Mr. Tittle denied doing any such activities

4

recently, testifying he might go to the fairgrounds twice a month to sit on a bench and watch the horses go around the track. (Tr. 333). He found this activity soothing. (Tr. 334).

Twice during the hearing Mr. Tittle asked to stand. (Tr. 316, 332).

The VE then testified. He identified Mr. Tittle's past work as factory laborer (DOT 7053687-014, medium exertion as generally performed, heavy exertion as actually performed), small parts assembler (DOT 754.685-014, light exertion as generally and actually performed), and sawmill laborer (DOT 669.687-018, medium exertion as generally performed, heavy exertion as actually performed), all unskilled positions. (Tr. 345-46). The ALJ asked the VE if a hypothetical individual of Mr. Tittle's age, education, and work history could perform Mr. Tittle's past work if subject to the following limitations: can lift and carry fifty pounds occasionally, twenty-five pounds frequently; stand and walk for six hours of an eight-hour workday; sit for six hours of an eight-hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently stoop, kneel, crouch, and crawl; limited to performing simple, routine, and repetitive tasks; occasionally interact with supervisors, coworkers, and the public; and limited to routine workplace changes. (Tr. 346). The VE testified such an individual could perform all three past work positions but clarified that such an individual could perform the factory laborer and sawmill laborer jobs as generally performed, not as Mr. Tittle actually performed them. (Tr. 346-47). The VE identified other positions the hypothetical individual could perform, including janitor (DOT 381.687-018, medium exertion, unskilled), dishwasher/kitchen helper (DOT 318.687-010, medium exertion, unskilled), and hospital cleaner (DOT 323.687-010, medium, unskilled).

The ALJ then asked the VE if the hypothetical individual could perform Mr. Tittle's past work if restricted as follows: can lift and carry twenty pounds occasionally, ten pounds frequently;

stand and walk for four hours of an eight-hour workday; sit for six hours of an eight-hour workday; occasionally climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl; limited to simple, routine, repetitive tasks; occasional interaction with supervisors, coworkers, and the public; and limited to routine workplace changes. (Tr. 347-48). The VE testified the hypothetical individual could perform as a small parts assembler but not as a factory or sawmill laborer. (Tr. 348). The VE identified other positions the hypothetical individual could perform, including electrical accessories assembler (DOT 729.687-010), laundry worker (DOT 302.685-010), and inspector/hand packager (DOT 559.687-074), all unskilled positions requiring light exertion. (*Id.*).

If the hypothetical individual were further restricted to standing and walking for just two hours in an eight-hour workday, the individual would still be able to perform as an electrical accessories assembler and as an inspector/hand packager, but would be unable to perform any of Mr. Tittle's past work or the laundry position. (349-50, 353).

In addition, the VE testified that employers will not tolerate a worker who is off-task more than ten percent of an eight-hour workday. (Tr. 352).

B.    **The Second Hearing**

Mr. Tittle did not attend the second hearing, but his counsel offered a brief statement and the ALJ took additional VE testimony. (Tr. 278-93). Mr. Tittle's counsel provided the ALJ with updated counseling records and X-rays showing significant cervical disc disease. (Tr. 283). The ALJ determined she would rely on Mr. Tittle's prior testimony and the prior classification of his past work. (Tr. 287).

The ALJ then asked the VE if a hypothetical individual of Mr. Tittle's age, education, and work experience could perform Mr. Tittle's past work if restricted as follows: limited to the full range of medium exertion work; can frequently climb ramp and stairs; occasionally climb ladders, ropes, and scaffolds; frequently stoop, kneel, crouch, and crawl; frequently reach overhead with the upper left extremity; simple, routine tasks; occasional interaction with supervisors, coworkers, and the public; and routine workplace changes. (Tr. 288-89). The VE testified such an individual could perform Mr. Tittle's past work. (Tr. 289). The VE identified other positions the hypothetical individual could perform, including hand packager (DOT 920.587-018), cleaner (DOT 919.687-014), and stockroom laborer (DOT 922.687-058), all unskilled positions requiring medium exertion. (Tr. 290).

Counsel for Mr. Tittle then asked the VE if a hypothetical individual under the following limitations could perform Mr. Tittle's past work: can lift twenty pounds occasionally, ten pounds frequently; stand and walk for two hours in an eight-hour workday; limited to walking short distances on even surfaces; occasionally bend, stoop, and crouch; avoid unprotected heights and dangerous machinery; and limited to simple, routine tasks; occasional interaction with supervisors, coworkers, and the public; and routine workplace changes. (TR. 290). The VE testified such an individual would not be able to perform Mr. Tittle's past work. (Tr. 291). The VE clarified that a limitation to standing and walking two hours and the limitation to walking short distances limits the individual to a sedentary position. (*Id.*).

If, under the limitations of the ALJ's first hypothetical, the individual was further restricted to no interaction with the public and working in isolation from supervisors and coworkers, that

individual would be unable to perform Mr. Tittle's past work. (*Id.*). The VE clarified that working in isolation is not consistent with competitive employment. (*Id.*).

C.     **The Third Hearing**

The final hearing was held on February 14, 2020. (Tr. 248-77). Mr. Tittle attended the hearing through video from the Mansfield Correctional Institution (MCI). (Tr. 249). Counsel for Mr. Tittle reiterated the severe impairments, including lumbar disc disease, plantar fasciitis, depression, anxiety, post-traumatic stress disorder, personality disorder, degenerative joint disease, and schizophrenia. (Tr. 251).

Mr. Tittle testified he cannot work due to back and shoulder pain, knee pain, pain on the bottom of his feet, and memory issues. (Tr. 263). He  requested treatment at MCI but has only received inhalers for his pulmonary disorder. (Tr. 264-65). He was also able to borrow a neighboring inmate's cane for a time. (Tr. 264). Before incarceration, Mr. Tittle was prescribed Seroquel, Klonopin, and Zoloft. (Tr. 265). MCI reduced his dosage of Zoloft and refused to provide Seroquel and Klonopin. (*Id., 269*).

In response to the ALJ's question about any chores or jobs he has to do at MCI, Mr. Tittle stated he was unable to sweep or mop and he is housed in the medical ward where he is "locked down all day long." (Tr. 266, 267). Mr. Tittle does not interact with others throughout the day; he has his own room in the medical ward and all meals are brought to him. (Tr. 267).

Mr. Tittle testified to hearing voices, having difficulty sleeping, and experiencing continued pain in his back and hip. (Tr. 268). Being segregated and keeping to himself helps him mentally, somewhat. (*Id.*). Mr. Tittle confirmed he can stand and walk for about ten minutes. (Tr. 269).

The VE then testified. He classified Mr. Tittle's past relevant work as general laborer (DOT 589.687-026, medium exertion, unskilled). (Tr. 272). The ALJ then asked the VE if a hypothetical individual of Mr. Tittle's age, education, and work experience could perform Mr. Tittle's past work if restricted as follows: can perform a full range of medium work; frequently climb ramps and stairs; frequently stoop, kneel, crouch, and crawl; frequently perform overhead reaching with the left upper extremity; limited to simple, routine tasks; occasional interaction with supervisors, coworkers, and the public; and limited to routine workplace changes. (*Id.*). The VE testified such a hypothetical individual could perform Mr. Tittle's past work as a general laborer. (*Id.*). The VE identified other positions the hypothetical individual could perform, including packager (DOT 920.687-018, medium, unskilled), janitor (DOT 381.687-018, medium, unskilled), and dishwasher (DOT 318.687-010, medium unskilled). (Tr. 273).

Counsel for Mr. Tittle then asked the VE if a hypothetical individual under the following limitations could perform Mr. Tittle's past work: can perform light work; can sit for a total of six hours in an eight-hour workday; stand for a total of four hours in an eight-hour workday; walk for a total of four hours in an eight-hour work day; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl; limited to simple, routine tasks; occasional interaction with supervisors, coworkers, and the public; and limited to routine workplace changes. (Tr. 273-74). The VE testified such an individual could not perform Mr. Tittle's past work. (Tr. 274). If the standing and walking limitations were further reduced to two hours in an eight-hour workday, the hypothetical individual would be limited to sedentary work. (Tr. 275). According to the VE, an employer will tolerate an employee off task no more than ten

percent of the workday and absent no more than once per month. (*Id.*). Finally, the VE testified

that a limitation to working in isolation is work-preclusive. (*Id.*).

## II.  PERSONAL EVIDENCE

Mr. Tittle was 47 years old at the time of his alleged onset date, and 54 years old at the

time of the last administrative hearing. (Tr. 356). Mr. Tittle completed his GED. (Tr. 304).

## III.  RELEVANT MEDICAL EVIDENCE

Mr. Tittle received mental health services through the Counseling Center. In February

2014, during an initial interview with Andrew B. Allen, M.A.Ed., PC/CR, Mr. Tittle endorsed

symptoms of depression and anxiety, including trouble sleeping, not having the will to do

anything, having nervous breakdowns, and feeling like something terrible will happen to him. (Tr.

1093). Mr. Tittle also reported hearing voices and avoiding crowds. (*Id.*).

On March 3, 2014, Mr. Tittle reported continued anxiety. (Tr. 1092). Mr. Allen noted Mr.

Tittle spoke in a quick, forced manner, was very tangential, made loose associations to other

topics, and made very grandiose statements about himself. (*Id.*). Mr. Tittle's eyes darted around the

room and he made very little eye contact with the counselor. (*Id.*).

On March 13, 2014, Mr. Allen noted Mr. Tittle "improved significantly since the previous

session," though his feelings of paranoia remained. (Tr. 1091). Again, Mr. Tittle spoke quickly and

made little eye contact, but he appeared physically relaxed in his chair. (*Id.*). Mr. Tittle continued

to endorse hearing voices but explained that he was generally able to tune them out. (*Id.*).

On April 2, 2014, Mr. Tittle was very animated and fidgeted in his chair. (Tr. 1089). Mr.

Allen noted Mr. Tittle was able to focus on his current concerns and tasks. (*Id.*). On April 7, 2014,

Mr. Tittle expressed frustration about being removed from a Section 8 voucher list. (Tr. 1088). Mr.

Allen described Mr. Tittle as agitated and animated throughout the session, and he continued to make grandiose statements. (*Id.*).

On July 8, 2014, Mr. Tittle visited the emergency department after cleaning some horse stalls when he began to experience the sudden onset of lower back pain radiating into his left buttock. (Tr. 1158). Examination showed moderate lumbar spine and paraspinous musculature tenderness. (*Id.*). Though Mr. Tittle's gait was normal, he had decreased sensation to the lateral left leg with light touch. (*Id.*). Mr. Tittle was discharged with prescriptions for Percocet, Naprosyn, and Valium. (*Id.*).

On July 11, 2014, Mr. Tittle returned to the emergency room for more pain medication; he expressed concern about running out before he could see his doctor the following week. (*Id.*). Mr. Tittle had some paraspinal tenderness and an antalgic gait, though his strength and sensation were symmetrical. (*Id.*). Mr. Tittle was discharged with another prescription for Percocet. (*Id.*).

On July 15, 2014, Mr. Tittle was involved in a motor vehicle accident. (Tr. 1146). At the emergency department, Mr. Tittle complained of neck and back pain. (*Id.*). Physical examination revealed tenderness to palpation of his spine but without evident trauma. (*Id.*). Imaging of Mr. Tittle's cervical spine revealed multi-level degenerative changes. (Tr. 1148). An X-ray of the lumbar spine showed mild degenerative disc disease with multi-level disc space narrowing. (Tr. 1152). An X-ray of the thoracic spine showed mild degenerative changes with mild disc space narrowing. (Tr. 1154).

On July 16, 2014, Mr. Tittle met with Aly M. Zewail, M.D., and complained of back pain following the above-referenced car collision. (Tr. 1199). Physical examination was normal and Dr.

11

Zewail noted Mr. Tittle walked with a normal gait. (Tr. 1200). Dr. Zewail prescribed Flexeril. (Tr.

1201).

On September 8, 2014, Mr. Tittle met again with Dr. Zewail, complaining of left shoulder

pain. (Tr. 1185). He also endorsed heel pain when standing on his feet for more than thirty

minutes. (*Id.*).

On November 1, 2014, Mr. Tittle arrived at the emergency department after twisting his

knee. (Tr. 1142). He reported severe diffuse pain throughout his leg and had difficulty bearing

weight on the leg. (*Id.*). Physical examination of the left knee revealed full range of motion, with

pain elicited at the extremes of flexion and extension, and with palpation over the lateral joint

line. (*Id.*). The medical provider noted no swelling and no instability. (*Id.*). An X-ray of the knee

was normal. (Tr. 1144). Mr. Tittle was diagnosed with acute left knee strain and was discharged

with prescriptions for Lodine and Percocet. (Tr. 1142).

On March 23, 2015, Mr. Tittle went to the emergency department after helping his friend

move a stove up a ramp. (Tr. 1140). He complained of lower back and right hip pain. (*Id.*). On

examination, Mr. Tittle exhibited tenderness to palpation over the right lumbar paraspinal

musculature. (*Id.*). The examination was otherwise unremarkable. (*Id.*). Mr. Tittle was diagnosed

with a lumbar strain and sent home with prescriptions for Naprosyn, Flexeril, and Norco. (*Id.*).

On November 5, 2015, Mr. Tittle met with Tai-Chi Kwok, M.D., for a new patient

examination and evaluation. (Tr. 1282). Mr. Tittle complained of pain in his feet and back, and

explained that his shoulder began hurting after he lifted some items. (*Id.*). Mr. Tittle endorsed

increased back pain with lifting over twenty pounds. (*Id.*). He told Dr. Kwok that his girlfriend has

to carry the vacuum cleaner upstairs for him. (*Id.*). Physical examination was normal. (Tr. 1284).

At the Counseling Center, Sarah Zimmerman, CNP, completed a psychiatric initial assessment, dated November 10, 2015. (Tr. 1274-76). Mr. Tittle reported feeling depressed most days, having difficulty with motivation, feeling nervous and fearful, having panic attacks three to four times a week, experiencing nightmares and hypervigilance, hearing voices that make vulgar comments, and having difficulty falling and staying asleep. (Tr. 1274). Mr. Tittle has had several concussions due to fighting when he was younger and claimed poor memory, concentration, and focus as a result. (Tr. 1275). In addition, Mr. Tittle endorsed chronic low back, joint, and hip pain. (Tr. 1274).

CNP Zimmerman noted Mr. Tittle was mildly agitated and defensive throughout the assessment. (Tr. 1275). Mental status examination revealed Mr. Tittle presented as irritable, anxious, and depressed, with affect (described as reactive and constricted) being congruent to those moods. (Tr. 1276). Mr. Tittle walked with a normal gait, was goal-directed and logical, exhibited intact short- and long-term memory and concentration, and displayed limited insight and judgment. (*Id.*). CNP Zimmerman assessed Mr. Tittle as having PTSD and panic disorder. (*Id.*). She noted schizoaffective disorder needed to be ruled out. (*Id.*). CNP Zimmerman continued Mr. Tittle's prescription for Zoloft and added Seroquel. (*Id.*).

On December 14, 2015, Mr. Tittle met with CNP Zimmerman and reported daily panic attacks, feeling easily overwhelmed, being emotionally reactive, and having continued chronic pain. (Tr. 1304). Mr. Tittle endorsed improved sleep with Seroquel, though he continued to wake up in the middle of the night. (*Id.*). Mr. Tittle was cooperative but agitated and displayed an irritable, anxious, and depressed mood. (*Id.*). His short-term and long-term memory and

13

concentration were grossly intact. (Tr. 1305). CNP Zimmerman noted he "is struggling with his anxiety and loneliness." (*Id.*).

Mr. Tittle returned to the Counseling Center and met with CNP Zimmerman on January 12, 2016. (Tr. 1302). Mr. Tittle's chief complaints included depression, anxiety, and boredom. (*Id.*). He reported attending his daughter's wedding and having a good time with her, receiving rides from neighbors when needed, and trying to talk to others when he is at food pantries. (*Id.*). Mr. Tittle exhibited a calm and cooperative attitude, but continued to display an anxious and depressed mood. (*Id.*). Short- and long-term memory and concentration were grossly intact. (*Id.*).

On February 23, 2016, Mr. Tittle met with CNP Zimmerman. (Tr. 1300). Though Mr. Tittle denied drinking, CNP Zimmerman noted he smelled of alcohol and had poor balance. (*Id.*). Mr. Tittle endorsed improved sleep, though he continued to wake up in the middle of the night and could not always fall back asleep. (*Id.*). Mr. Tittle had a blunted affect and was irritable and depressed. (*Id.*). Short- and long-term memory and concentration were grossly intact. (Tr. 1301). He reported feeling better mentally when he gets out of the house and works, but then has physical pain. (Tr. 1300). CNP Zimmerman switched Mr. Tittle to an extended-release form of Seroquel and continued his prescriptions for Zoloft and Klonopin. (Tr. 1301).

In April 2016, Mr. Tittle returned to the Counseling Center. (Tr. 1298). CNP Zimmerman noted that Mr. Tittle again smelled strongly of alcohol. (*Id.*). Mr. Tittle reported feeling depressed with little energy or motivation, and overwhelmed by physical pain and difficult situations. (*Id.*). He also endorsed feeling more irritable and depressed when the Klonopin wears off in the afternoon. (*Id.*). Mr. Tittle also noted waking up more frequently during the night since switching to Seroquel XR. (*Id.*). Mental status examination revealed an irritable, anxious, and depressed

14

mood, but grossly intact short- and long-term memory and concentration. (Tr. 1298-99). CNP Zimmerman increased Mr. Tittle's prescription for Zoloft, reverted to the regular form of Seroquel, and continued his prescription for Klonopin. (Tr. 1299).

In July 2016, Mr. Tittle reported feeling anxious and depressed. (Tr. 1296). He informed CNP Zimmerman that he would have to move because he cannot get along with his neighbors. (*Id.*). Mr. Tittle continued to endorse increased symptomology when his Klonopin wears off in the afternoon. (*Id.*). His mood was irritable, anxious, and depressed, with a constricted affect, and mental status examination was otherwise normal. (*Id.*). CNP Zimmerman increased Mr. Tittle's prescriptions for Zoloft and Klonopin and continued Seroquel. (*Id.*).

Mr. Tittle was lost to the Counseling Center while incarcerated until he returned in April 2017 for an assessment. (Tr. 1345). On May 8, 2017, Mr. Tittle reported depression, irritability, nightmares and flashbacks of past abuse, and anxiety. (Tr. 1341). He wanted to restart his prescription for Klonopin. (*Id.*). Dr. Prasad noted Mr. Tittle was irritable, demanding, and got aggravated with her recommendation to avoid potentially addictive medications. (Tr. 1343). Mr. Tittle received prescriptions to restart Zoloft and Seroquel. (*Id.*).

On May 12, 2017, Mr. Tittle met with Mona Park, MS, LPPC. (Tr. 1347). The progress note indicates Mr. Tittle was upset that he was referred for counseling and upset that Dr. Prasad did not give him Klonopin. (*Id.*). Mr. Tittle reported he did not want counseling and left the session after twenty minutes. (*Id.*). He did not show up for his appointment on May 17, 2017. (Tr. 1349).

On June 29, 2017, Mr. Tittle saw Vera Astreika, M.D., at the Counseling Center. (Tr. 1339). Mr. Tittle reported being homeless and feeling anxious and depressed all the time. (*Id.*). Dr.

Astreika noted that Mr. Tittle refused to answer most questions, claimed he was not satisfied with his current psychiatric medication management, and claimed Zoloft made him tired. (*Id.*). Mental status examination showed that though while cooperative, Mr. Tittle was tense, made poor eye contact, and was depressed. (Tr. 1339-40). Dr. Astreika concluded Mr. Tittle was stable but would benefit from medication management. (Tr. 1340). Mr. Tittle did not return for medication management or counseling and the Counseling Center closed his client file when he was not seen for three months. (Tr. 1355-56).

In July 2017, Mr. Tittle went to the emergency room after falling down a set of stairs. (Tr. 1397). He reported feeling lightheaded after carrying groceries upstairs and falling as a result. (*Id.*). Mr. Tittle complained of right hip and rib pain. (*Id.*). Mr. Tittle had right hip pain with range of motion testing and pain over the greater trochanter. (*Id.*). He was discharged with a prescription for Naprosyn. (Tr. 1398).

A cervical spine CT, dated December 21, 2017, revealed spondylosis from C2-C3 to C7-T1. (Tr. 1408-09). He had central canal spinal stenosis and stenosis of the right and left intervertebral neuroforamina, at all levels except C2-C3 and C7-T1, ranging in severity from mild to severe. (*Id.*).

On March 1, 2019, Mr. Tittle arrived at the emergency department with dental pain. (Tr. 1436). He was prescribed anti-inflammatories and antibiotics, and instructed to follow up with his dentist. (*Id.*). The medical record notes Mr. Tittle explicitly requested twenty Percocet tablets and was upset about not receiving any narcotics. (*Id.*). Mr. Tittle refused to leave the emergency department when the medical provider declined to provide a prescription for narcotics. (*Id.*). The

medical provider called the police, who arrested Mr. Tittle on the basis of an outstanding warrant. (*Id.*).

Thereafter, Mr. Tittle's medical care was provided through Ohio correctional institutions. On November 6, 2019, Mr. Tittle underwent an evaluation during which he reported nightmares and flashbacks to a car accident in 1990, feeling nervous and anxious, having memory issues and mood swings, and having poor energy and motivation. (Tr. 1489). The provider observed Mr. Tittle ambulate without hindrance or the need for assistance. (*Id.*). A mental status examination revealed Mr. Tittle was pleasant, cooperative, alert, and oriented. (*Id.*). He demonstrated poor insight and judgment. (*Id.*). Mr. Tittle appeared attentive throughout the evaluation. (*Id.*). The medical provider observed that Mr. Tittle presented with a stable but down mood and full effect. (*Id.*). His thoughts appeared to be organized and logical. (*Id.*). He denied hallucinations or feeling as though others were plotting again him. (*Id.*).

On January 14, 2020, Mr. Tittle met with Jodie Slone, CNP, and reported his need for an inhaler and a rescue inhaler. (Tr. 1460). On January 17, 2020, Mr. Tittle filed a health service request for a cane. (Tr. 1456). He complained about pain in his hip. (*Id.*).

## IV.   MEDICAL OPINIONS

Perry Williams, M.D., examined Mr. Tittle on July 16, 2013. (Tr. 1077-78). Dr. Williams noted crepitus and reduced range of motion in the knees, tenderness and reduced range of motion in the lumbar spine, and reduced range of motion in the right shoulder. (Tr. 1077). Mr. Tittle reported being involved in a vehicular accident in 1990 that caused multiple injuries to his back, knees, hips, and pelvis, resulting in a decreased ability to walk and stand. (*Id.*). He also reported having panic attacks. (*Id.*). Lumbar spine imaging showed mild degenerative joint disease at L4 and

mild degenerative changes with narrowing of the disc space at L4-L5. (Tr. 1079). Dr. Williams opined Mr. Tittle could stand and walk for two to four hours in an eight-hour workday, one to two hours without interruption; could sit for four to six hours in an eight-hour workday, two to four hours without interruption; could lift and carry up to twenty pounds frequently, up to twenty-five pounds occasionally; and was markedly limited in his abilities to push/pull, bend, and reach. (Tr. 1078).

On August 12, 2013, John A. Comley, Psy.D., evaluated Mr. Tittle. Mr. Tittle reported that his feet hurt "all the time," his back hurts, and his arms and hands go numb. (Tr. 1082). Mr. Tittle also endorsed dizziness, headaches, nausea, eye problems, stomach problems, and numbness and tingling. (*Id.*). Mr. Tittle reported that he often argues with others, lacks guilt, lies, cheats, will attack people, and has a temper. (*Id.*). Mr. Tittle claimed to have trouble getting along with supervisors and finishing his work. (Tr. 1082-83). Mr. Comley noted Mr. Tittle's demeanor was "almost negative and hostile." (Tr. 1083). He found Mr. Tittle was angry and annoyed with his questions and that his behavior was withdrawn and hypoactive. (*Id.*). His speech was normal, not suggesting a thought disturbance. (*Id.*). Mr. Tittle reported symptoms of depression and anxiety and being forgetful and unable to concentrate. (Tr. 1084). Mr. Comley performed cognitive functioning testing and found Mr. Tittle's scores were much lower than expected, "suggesting motivation or other factors are reducing his abilities." (*Id.*). Mr. Comley did not offer an opinion as to Mr. Tittle's functional limitations or abilities.

On May 5, 2014, Lyndsey Ruhe, D.O., evaluated Mr. Tittle. (Tr. 1130-33). Mr. Tittle reported low back pain radiating to his hips and down into his legs and feet, worse on the right. (Tr. 1130). He described his back pain as a constant ache with occasional sharp pain on a regular

basis. (*Id.*). Mr. Tittle reported left shoulder pain, described as achy and worse with movement in any direction. (*Id.*). Mr. Tittle also described sharp bilateral foot pain with standing for longer than thirty to forty-five minutes, left worse than right. (*Id.*). Mr. Tittle claimed difficulty at times with climbing steps due to his back and hip pain. (Tr. 1131). He reported being able to sit for thirty minutes at a time, stand for an hour, and walk one hundred feet before he is uncomfortable. (*Id.*). He stated he can carry up to twenty pounds and can cook, clean, bathe, and dress himself. (*Id.*).

Physical examination revealed a positive straight leg raise test on the left side, tenderness over his spinous process starting at L4 and L5, tenderness to palpation of the left paraspinal muscles, and decreased range of motion in his left shoulder. (Tr. 1132). Dr. Ruhe noted Mr. Tittle's gait was "stiff but relatively stable on a flat surface." (*Id.*). She noted Mr. Tittle was able to walk on his toes but was not able to walk on his heels. (*Id.*). Dr. Ruhe did not observe deficits in muscle strength. (*Id.*). Dr. Ruhe recommended Mr. Tittle be limited to "moderate work duties and not be required to lift heavy objects over 20 pounds at any one time because of his significant pain issues in multiple areas of his body," and that he only be required to ambulate over short distances on even surfaces." (*Id.*). Additionally, Dr. Ruhe recommended limiting Mr. Tittle from crawling, climbing a ladder, or walking on uneven surfaces. (*Id.*).

Mr. Comley evaluated Mr. Tittle again on August 29, 2015. (Tr. 1244-1248). Mr. Tittle reported having panic attacks and anxiety, back pain, and hip problems that affect his feet, hip, and shoulder. (Tr. 1245). Mr. Tittle hears voices and does not like to be around others. (*Id.*). He asserted problems with performing household chores because he "gets distract[ed] all the time." (Tr. 1246). Mr. Comley found no disturbances in consciousness, noting Mr. Tittle did not show clouding, drowsiness, or an inability to sustain. (*Id.*). Mr. Comley described Mr. Tittle as somewhat

19

disheveled, unkempt, preoccupied, and distant. (*Id.*). He was fairly cooperative but was hyperactive and tended to minimize his responses. (*Id.*). Mr. Tittle reported feeling stressed during the evaluation. (*Id.*). Mr. Tittle refused to take part in sensorium and cognitive function testing. (Tr. 1247). Mr. Comley acknowledged Mr. Tittle's Verbal IQ testing in 2013, which suggested "an element of underachieving." (*Id.*). Mr. Comley opined the test results were significantly lower than Mr. Tittle's true abilities. (*Id.*). Mr. Tittle claimed to suffer from post-traumatic stress disorder, schizophrenia, and psychosis, but did not offer details or elaboration. (Tr. 1246). Mr. Comley opined Mr. Tittle was overstating his mental health issues with little substantiation. (Tr. 1247).

Mr. Comley completed a mental functional capacity assessment. He opined Mr. Tittle was markedly limited in the following areas:

- understanding and remembering detailed instructions;
- carrying out detailed instructions;
- maintaining attention and concentration for extended periods of time;
- working in coordination with or in proximity to others without being distracted by them;
- completing a normal workday without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods;
- interacting appropriately with the general public;
- accepting instructions and responding appropriately to criticism from supervisors;
- getting along with coworkers or peers without distracting them; and
- maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness.

(Tr. 1244).

Dr. Williams evaluated Mr. Tittle a second time on August 31, 2015. (Tr. 1240-41). On physical examination, Dr. Williams noted spinal tenderness and decreased range of motion and right knee tenderness with crepitus. (Tr. 1240). Mr. Tittle described plantar fasciitis, and right hip, knee, and back pain, worse with activity and better with rest. (*Id.*). Mr. Tittle additionally noted left neck and arm pain. (*Id.*). Dr. Williams opined Mr. Tittle could stand and walk for three to four

hours in an eight-hour workday, a half-hour to an hour without interruption; could lift and carry up to ten pounds frequently, up to twenty pounds occasionally; and was markedly limited in his abilities to push/pull and bend, moderately limited in his ability to reach. (Tr. 1241). Mr. Williams did not opine any sitting limitations.

## THE ALJ'S DECISION

The ALJ's decision, dated March 4, 2020, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since August 31, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: affective disorder, personality disorder, drug/substance addiction disorder, and degenerative disc disease (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, and in accordance with the Appeals Council's remand order, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). The claimant can stand/walk six hours and sit for six hours in an eight-hour workday. The claimant can occasionally climb ladders, ropes, and scaffolds and frequently climb ramps and stairs, stoop, kneel, crouch, and crawl. The claimant can frequently perform left overhead reaching. The claimant is limited to performing simple, routine tasks and occasionally interact with supervisors, coworkers, and the public. The claimant is limited to routine workplace changes.

6. The claimant is capable of performing past relevant work as a general laborer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security
        Act, from August 31, 2012, through the date of this decision (20 CFR
        404.1520(f) and 416.920(f)).

(Tr. 224-35).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is

more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &*

*Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if

supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d

830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial

evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh

the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if

substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the

court cannot overturn "so long as substantial evidence also supports the conclusion reached by the

ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a

"zone of choice" within which the Commissioner can act, without fear of court interference.

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.   Was claimant engaged in a substantial gainful activity?

2.   Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.   Does the severe impairment meet one of the listed impairments?

4.   What is claimant's residual functional capacity and can claimant perform past relevant work?

5.   Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Mr. Tittle claims the ALJ's finding that he is capable of medium exertion work is not supported by substantial evidence. (Pl.'s Br., ECF #15, PageID 1636). He takes issue with the ALJ's decision to increase his exertion level from light to medium after remand from the Appeals Council (AC) without evidence of medical improvement. (*Id.* at PageID 1639). Mr. Tittle also

24

argues the ALJ erred in giving no weight to Dr. Ruhe's medical opinion after "instructions to reconcile having given Dr. Ru[h]e's opinion 'great weight' without having incorporated all of Dr. Ru[h]e's limitations into the ALJ's residual functional capacity finding, and to address the opinions of Drs. Williams and Comley," and to give the most weight to the state agency consulting physicians and psychologists because their opinions did not consider any evidence from the subsequent six years' worth of medical records. (*Id.* at PageID 1368; *see also* Pl.'s Reply Br., ECF #17, PageID 1658).

The Commissioner responds that, to the extent Mr. Tittle claims error based on the ALJ's adherence to the AC remand order, the challenge is without merit because the Court only has authority to review a final decision, not interim orders such as the AC remand. (Comm'r's Br., ECF #16, PageID 1644-45). The Commissioner also argues the ALJ appropriately evaluated the medical opinions and her determinations with respect to the weight assigned to those opinions were supported by substantial evidence. (*Id.* at PageID 1645).

A brief review of ALJ Ma's prior written decision is necessary to illustrate Mr. Tittle's argument. On March 14, 2016, the ALJ issued a written decision finding Mr. Tittle not disabled. (Tr. 425-38). She concluded Mr. Tittle had the residual functional capacity to perform light work and was limited to sitting for six hours, standing for four hours, and walking for four hours in an eight-hour workday; could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; could occasionally stoop, kneel, crouch, and crawl; was limited to simple, routine, repetitive tasks; could occasionally interact with supervisors, coworkers, and the public; and could handle only routine workplace changes. (Tr. 430). On March 29, 2017, the AC vacated ALJ Ma's written decision and remanded the case for additional proceedings. (Tr. 445).

The AC noted that ALJ Ma did not assign weight to the opinions of Drs. Comley and Perry. (*Id.*). Additionally, the AC noted that ALJ Ma assigned Dr. Ruhe's medical opinion great weight but did not reconcile the discrepancy between the opinion that Mr. Tittle can only ambulate short distances over an even surface and ALJ Ma's residual functional capacity (RFC) assessment that did not include any such limitation. (*Id.*). The AC instructed ALJ Ma to "give further consideration to the treating and nontreating source opinions pursuant to 20 CFR 404.1527 and 416.927 and explain the weight given to each," obtain a medical expert if necessary, "give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to the record in support of the assessed limitations," and obtain supplemental evidence from a VE if warranted by the expanded record. (Tr. 448).

As detailed above, ALJ Ma subsequently found Mr. Tittle capable of greater physical exertion and determined Dr. Ruhe's opinion was entitled to "little weight as it is generally inconsistent with the medical evidence of record." (Tr. 227, 231).

Mr. Tittle argues the AC's instructions on remand are limited to reconciling the great weight assigned to Dr. Ruhe's opinion and the restriction to walking on even ground for short distances. This is not the case. Instead, the AC instructed the ALJ to give further consideration to the medical source opinions, explain the weight assigned to each, and give further consideration to Mr. Tittle's maximum RFC and provide specific references to the record in support. (Tr. 448). I agree with the Commissioner that a district court may only review the final decision of the Commissioner, not interim orders vacated and remanded after AC reconsideration. 42 U.S.C. § 405(g). That said,  the ALJ must still adequately articulate reasons for the weight assigned to medical source opinions, and those determinations must be supported by substantial evidence.

For disability applications (like Mr. Tittle's) that are filed before May 27, 2017, medical opinions are weighed by the process set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). The regulations establish a hierarchy of medical opinions where an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination, §§ 404.1527(c)(1) and 416.927(c)(1), and an opinion from a medical source who regularly treats the claimant is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship, §§ 404.1527(c)(2) and 416.927(c)(2). In the absence of a controlling treating source opinion, as is the case here, an ALJ must "evaluate all medical opinions" with regard to the factors set forth in §§ 404.1527(c) and 416.927(c). *Walton v. Comm'r of Soc. Sec.*, No. 97-2030, 1999 WL 506979, at *2 (6th Cir. 1999). These factors include supportability, consistency of the opinion with other evidence, and specialty or expertise in the medical field related to the individual's impairments. *Id.*

As to the opinions of the psychological consultants, Aracelis Rivera, Psy.D. (provided in September 2013) and Vicki Warren, Ph.D. (provided in May 2014), the ALJ afforded them partial weight, explaining that "to the extent the doctors determine the claimant had no more that moderate limitations in functioning, such findings are consistent with the medical evidence of record." (Tr. 230). The ALJ determined the opinion of State agency medical consultant, Anne Prosperi, D.O., was also entitled to partial weight. (Tr. 230-31). The ALJ applied all of Dr. Prosperi's opined physical limitations but did not agree with Dr. Prosperi's opinion that there was insufficient evidence to establish an RFC before April 15, 2013. (*Id.*).

ALJ Ma afforded little weight to the opinion of Perry S. Williams, M.D., who provided a physical functional capacity assessment. (Tr. 231). She concluded the record does not support Dr.

Williams's restrictive RFC assessment because the diagnostic imaging showed mild degenerative changes. (*Id.*). For support, the ALJ cites to lumbar spine imaging result from 2013 showing mild degenerative changes (Tr. 1079), lumbar spine imaging result from 2014 showing mild degenerative disc disease with multi-level disc space narrowing (Tr. 1152), a thoracic spine imaging result from 2014 showing mild disc space narrowing (Tr. 1154), and a cervical spine CT showing multi-level degenerative changes with some disc bulging, spurring, and narrowing. (Tr. 1218). The ALJ noted the record showed some findings associated with Mr. Tittle's condition but concluded the overall record shows generally normal findings. (Tr. 231). The ALJ also considered Mr. Tittle's remaining capabilities in her evaluation of Dr. Williams's opinion, including cleaning out horse stalls, moving stoves, and carrying groceries. (Tr. 231). The ALJ's reliance on these alleged abilities is troubling because each time Mr. Tittle participated in these activities, he was injured and had to make a visit to the emergency room. (*See* Tr. 1397, 1140, 1158).

The ALJ gave little weight to Dr. Ruhe's opinion because it was generally inconsistent with the medical evidence of record. (Tr. 231). ALJ Ma pointed to the numerous records showing Mr. Tittle had a normal gait, and where Mr. Tittle's gait was antalgic, the ALJ noted his normal neurological examinations showing symmetric strength and sensation. (Tr. 231). In addition, the ALJ supports her conclusion with the diagnostic imaging noted above. (*See* Tr. 1079, 1152, 1154, 1218).

The ALJ did not cite to Mr. Tittle's most recent cervical spine CT from December 21, 2017 when discussing Dr. Williams and Dr. Ruhe's opinions. ALJ Ma did reference the 2017 scan elsewhere in the written decision, but the ALJ significantly mischaracterizes the findings. She asserts that "Diagnostic testing of the claimant's thoracic and cervical spine also show mild multi-

28

level degenerative changes," citing the second page of the cervical CT report, which states "multi-level degenerative changes, as described above." (Tr. 228, 1409). The first page of the CT report shows spondylosis from C2-C3 to C7-T1, along with disc narrowing and protrusions, and central canal spinal stenosis and stenosis of the right and left intervertebral neuroforamina, at all levels except C2-C3 and C7-T1, ranging in severity from mild to severe. (Tr. 1408-09).

Substantial evidence is a lenient standard, but the substantiality of evidence must take into account whatever in the record fairly detracts from its weight. *Brooks,* 531 F. App'x at 641. Here, the ALJ significantly mischaracterized objective medical evidence and other evidence that, if properly considered, could be supportive of and consistent with the medical opinions of Dr. Williams and Dr. Ruhe. Because the ALJ mischaracterized significant medical records and findings, her analysis of the medical opinions is not supported by substantial evidence. For these reasons, the matter should be remanded to the Commissioner.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and supplemental security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: May 11, 2022.

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and
Recommendation, a party may serve and file specific written objections to the
proposed findings and recommendations of the Magistrate Judge. *See* Fed. R.
Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly
asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or
waiver of the right to raise the issue on appeal, either to the district judge or in a
subsequent appeal to the United States Court of Appeals, depending on how or
whether the party responds to the Report and Recommendation. *Berkshire v.
Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not
merely indicate a general objection to the entirety of the Report and
Recommendation; "a general objection has the same effect as would a failure to
object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir.
1991). Objections should focus on specific concerns and not merely restate the
arguments in briefs submitted to the Magistrate Judge. "A reexamination of the
exact same argument that was presented to the Magistrate Judge without specific
objections 'wastes judicial resources rather than saving them and runs contrary to
the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186,
2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at
509). The failure to assert specific objections may in rare cases be excused in the
interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th
Cir. 2019).